[Crim. No. 44785. Second Dist., Div. Five. July 19, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO VELASQUEZ, Defendant and Appellant.

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Richard Lennon, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edward T. Fogel, Jr., and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ASHBY, J.—While in Los Angeles county jail on a charge of attempted murder, appellant was found in possession of a handmade knife. He was convicted by a jury of violating Penal Code section 4574, and he was sentenced to state prison.[1]

On the evening of February 12, 1983, Deputy Sheriff Koeth was on duty as "module officer" at the Los Angeles county jail, and it was his duty to check the prisoners. He went to appellant's cell, and observed appellant in a kneeling position sharpening a jail-made knife, commonly called a shank, by scraping or filing it on the concrete floor of the cell. He watched appel-

---

[1]Penal Code section 4574, subdivision (a), provides in pertinent part that "any person who, while lawfully confined in a jail or county road camp possesses therein any . . . deadly weapon . . . is guilty of a felony and punishable by imprisonment in the state prison for two, three, or four years."

lant do this for about 10 seconds, until appellant looked up, saw the officer, and quickly put the knife behind his back. The officer asked appellant to hand it over, and appellant complied. The weapon was a piece of metal torn from a bunk railing, with a sharpened tip at one end and cloth handle at the other.

Appellant testified in his own defense, admitting that he was making a knife from the railing of his bed when he was confronted by the officer. His purpose in making a knife was for "protection." Earlier that day he had been attacked in his cell by four inmates.[2] Appellant reported the attack to the afternoon module officer, although he did not identify his attackers because "[t]hat's not my style." The officer told appellant to go back to his cell. Appellant replied that he wanted something done, such as a transfer. The officer told him that if appellant did not go back to his cell he would be locked up in solitary confinement.[3] Although admitting at trial that he would have been safe in solitary confinement, appellant went back to his cell and made the knife because "they didn't do anything about it earlier." The knife "was going to be my protection. [¶] . . . . [¶] And if I can't get nobody to help me out, I'm going to do what I have to do to survive in that County Jail . . . ."

Appellant contends the trial court erred in refusing to instruct the jury on necessity as a defense. As appellant concedes, the case law under both Penal Code section 4574 and the analogous section 4502 relating to state prisons is squarely against him. ■ The purpose of these statutes is to protect inmates and officers from assaults with dangerous weapons perpetrated by armed prisoners. Evil intent or intended use for an improper purpose is not an element of the crime. The purpose of the statutes would be frustrated if prisoners were allowed to arm themselves in proclaimed or actual fear of anticipated attack by other inmates. Accordingly, it is well-established that arming for self-defense against a future anticipated attack is no defense to the crime. (*People* v. *Wells* (1945) 68 Cal.App.2d 476, 480, 481 [156 P.2d 979]; *People* v. *Crenshaw* (1946) 74 Cal.App.2d 26, 29-30 [167 P.2d 781]; *People* v. *Purta* (1968) 259 Cal.App.2d 71, 73-74 [66 Cal.Rptr. 38]; *People* v. *Wells* (1968) 261 Cal.App.2d 468, 478-480 [68 Cal.Rptr. 400]; *People* v. *Evans* (1969) 2 Cal.App.3d 877, 881-882 [82 Cal.Rptr. 877]; *People* v. *Rodriquez* (1975) 50 Cal.App.3d 389, 395 [123 Cal.Rptr. 185].)

Some of these authorities have suggested in dicta that self-defense might justify violation of the statute where the prisoner was under imminent mortal

---

[2]During "free time" all the cell doors are open and inmates have access to each other.

[3]Appellant speculated the officer did not believe him, since appellant had run away from the attack and had no marks on him.

attack, had no opportunity to seek protection of the authorities, and temporarily seized a prohibited weapon in order to save his life. (*People* v. *Purta, supra,* 259 Cal.App.2d at p. 74; *People* v. *Wells, supra,* 261 Cal.App.2d at pp. 479-480; *People* v. *Evans, supra,* 2 Cal.App.3d at pp. 881-882; see also *People* v. *King* (1978) 22 Cal.3d 12, 24 [148 Cal.Rptr. 409, 582 P.2d 1000] [Penal Code section 12021, prohibiting possession of firearms by a convicted felon, is not violated when the accused "is in imminent peril of great bodily harm or reasonably believes himself or others to be in such danger, and without preconceived design on his part a firearm is made available to him," and he temporarily possesses the firearm "for a period no longer than that in which the necessity or apparent necessity to use it in self-defense continues"]; cf. *People* v. *McClindon* (1980) 114 Cal.App.3d 336, 340 [170 Cal.Rptr. 492].) Here appellant was not under attack when found in possession of the deadly weapon. In fact, he did not even testify that his attackers of earlier that day had threatened to return.

Recognizing that appellant was not in immediate danger in the above sense, appellant contends there is a broader right, which he calls the defense of necessity, against future anticipated attack. He contends that *People* v. *Lovercamp* (1974) 43 Cal.App.3d 823 [118 Cal.Rptr. 110, 69 A.L.R.3d 668], an escape case, supports such a defense and should be extended to cases involving the possession of deadly weapons by prisoners. Appellant's analogy to *Lovercamp* is not well taken.

In *Lovercamp,* the two defendants had been threatened by another group of inmates. They complained to the authorities several times but nothing was done. On the day of the escape, 15 of the inmates again approached the defendants with the same threat, and there was actually a fight. The defendants were told by this group that they would see the group again. Fearing for their lives, the defendants escaped the California Rehabilitation Center. The appellate court held the defendants' offer of proof was improperly rejected by the trial court. Based on out-of-state authorities, the appellate court created an "extremely limited" "defense of necessity to an escape charge." (*Id.,* at p. 831.) It held the defense was available if five conditions were met: (1) the prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) there is no time for a complaint to the authorities or there exists a history of futile complaints which make any results from such complaints illusory; (3) there is no time or opportunity to resort to the courts; (4) there is no evidence of force or violence used toward prison personnel or other "innocent" persons in the escape; and (5) the prisoner immediately reports to the proper authorities when he has obtained a position of safety from the immediate threat. (*Id.,* at pp. 831, 832.)

If appellant had escaped from the jail, instead of making a deadly weapon, it is questionable whether he could satisfy even the first condition of *Lovercamp,* for he did not testify that the same group which attacked him before had threatened or was likely to attack him again "in the immediate future." (*Id.,* at pp. 831-832.) But this is not an escape case. Possession of deadly weapons by prisoners is an entirely separate problem that renders inappropriate appellant's reliance on *Lovercamp.*

As described in *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1010-1013 [138 Cal.Rptr. 515], the necessity defense created in the *Lovercamp* case is based on public policy, the same policy involved in so-called "choice of evil" statutes adopted in some jurisdictions, although not in the California Penal Code. (Berry, *The mysterious defense of necessity* (1979) 54 State Bar J. 384, 385-386.)[4] In *Lovercamp,* the lesser evil which the court was willing to tolerate was a nonviolent escape after which the prisoner would immediately report to the proper authorities. (*People* v. *Lovercamp, supra,* 43 Cal.App.3d at p. 832.) In this case the evil which appellant wishes the court to tolerate is possession of a deadly weapon by a prisoner. A jail in which the prisoners could assert a court approved "right" to possess deadly weapons for protection would be impossible to administer humanely and safely. The very existence of the weapons inevitably invites their use on other inmates and correctional officers. That is why our statutes prohibiting such possession by prisoners have always been construed to be absolute, and to permit no defense based on a claim of protection against future attack. (*People* v. *Wells, supra,* 68 Cal.App.2d at p. 481; *People* v. *Wells, supra,* 261 Cal.App.2d at pp. 478-479; *People* v. *Rodriquez, supra,* 50 Cal.App.3d at p. 395.) Nothing in *Lovercamp* supports abandoning this necessary and well-established rule.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 12, 1984.

---

[4]Section 3.02 of the Model Penal Code provides in pertinent part: "(1) Conduct which the actor believes to be necessary to avoid harm or evil to himself or to another is justifiable, provided that: [¶] (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and [¶] (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and [¶] (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear." (ALI, Model Pen. Code (Proposed Official Draft 1962) § 3.02, p. 45.)